1  JAMES F. CLAPP (145814)
   jclapp@sdlaw.com
2  ZACH P. DOSTART (255071)
   zdostart@sdlaw.com
3  DOSTART CLAPP & COVENEY, LLP
   4370 La Jolla Village Drive, Suite 970
4  San Diego, California 92122-1253
   Tel: 858-623-4200
5  Fax: 858-623-4299

6  J. DANIEL HOLSENBACK (145640)
   dan@holsenbackapc.com
7  HOLSENBACK APC
   4370 La Jolla Village Drive, Suite 970
8  San Diego, CA 92122-1253
   Tel: 619-269-4634
9  Fax: 619-269-4635

10 Attorneys for Plaintiff

11

12              UNITED STATES DISTRICT COURT

13     CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

14

| 15 | RITA PIMENTAL dba RITA'S CAFE, individually and on behalf of all others similarly situated, | CASE NO: **SACV11-00918 CJC (RNBx)** |
|---|---|---|
| 16 | | |
| 17 | Plaintiff, | CLASS ACTION COMPLAINT FOR: 1. USURY 3. UNFAIR COMPETITION 3. MONEY HAD AND RECEIVED 4. DECLARATORY RELIEF |
| 18 | vs. | |
| 19 | MERCHANT CAPITAL SOURCE, LLC, | [JURY TRIAL DEMANDED] |
| 20 | Defendant. | |
| 21 | | |

22

23                    INTRODUCTION

24      1.    This is class action brought under the California Usury Law, the

25 California common law, and the California Unfair Competition Law, Cal. Bus. &

26 Prof. Code § 17200 et seq. ("UCL").  Plaintiff alleges that defendant violated these

27 laws by loaning money to borrowers at interest rates that are illegal under California

28 law.

                                1

## PARTIES

2.  Plaintiff Rita Pimental dba Rita's Cafe is a sole proprietorship with locations in Arcata, California and Eureka, California. Pimental is an individual residing in the State of California.

3.  Defendant Merchant Capital Source, LLC is a California limited liability company with its principal place of business in Orange County, California.

## JURISDICTION AND VENUE

4.  This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), in that the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and defendant is a citizen of California, whereas more than two-thirds of the members of the plaintiff class are citizens of states other than California.

5.  Venue is proper in this judicial district because some of the complained of conduct occurred in this judicial district, and the defendant is headquartered here.

## FACTUAL BACKGROUND

6.  Defendant is in the business of providing a form of short-term financing known as a "merchant cash advance." In a merchant cash advance, a finance company lends a borrower (the "merchant") a lump sum of money secured by the borrower's future credit card sales. The borrower is required to direct its credit card processing company to pay the finance company a percentage of the borrower's credit card receipts until the loan is repaid in full. The effective annual interest rate on these loans exceeds the interest rate limit established by Article XV, Section 1(2) of the California Constitution. Plaintiff is informed and believes that defendant is not licensed or otherwise authorized to make loans in the State of California.

7.  Within the last four years, plaintiff has entered into several merchant cash advance transactions with defendants. The loan agreements were in writing, and they were substantially similar to the document entitled "Purchase Agreement,"

2

1 │ attached hereto as Exhibit 1 (the "Agreement").  The effective annual interest rate
2 │ on the loan memorialized in the Agreement exceeded 65%.  (Plaintiff has attached
3 │ an earlier version of the Agreement as Exhibit 2.  Exhibit 2 is substantively the same
4 │ as Exhibit 1, but it does not include the class action waiver referenced in paragraph
5 │ 32 below.)

6 │        8.     Plaintiff is informed and believes that defendant contends that the
7 │ merchant cash advances they made to plaintiff and other class members are not
8 │ subject to California's usury law because they are sales of future receivables instead
9 │ of loans.  However, Cal. Civ. Code § 1912 defines a "loan of money" as "a contract
10 │ by which one delivers a sum of money to another, and the latter agrees to return at a
11 │ future time equivalent to that which he borrowed."  The merchant cash advances
12 │ made by defendant to plaintiff and other borrowers meet the definition set forth in
13 │ Section 1912. Furthermore, the following additional facts establish that defendant's
14 │ merchant cash advances are loans rather than sales: (1) unlike a sale, which is
15 │ consummated when the money is paid and the property is delivered, the merchant
16 │ cash advance is not complete until the money advanced by defendant is repaid in
17 │ full; (2) defendant's only obligation in a merchant cash advance is to advance cash
18 │ to the borrower; (3) defendant does not bear any risk of capital loss in a merchant
19 │ cash advance other than the risk associated with the borrower's inability to pay; (4)
20 │ borrowers are required to reimburse defendant for any losses they incur in
21 │ connection with the advance; (5) defendant is entitled to accelerate the borrowers'
22 │ payments in the event of their default; (6) borrowers are required to submit a credit
23 │ application and submit to a credit check prior to entering into the merchant cash
24 │ advance; (7) defendant underwrites the merchant cash advance by assessing the
25 │ creditworthiness of the borrowers; (8) defendant collateralizes the merchant cash
26 │ advances by filing UCC-1 financing statements; and (9) defendant requires the
27 │ individual owners of the borrowers to execute personal guarantees.
28 │

CLASS ACTION COMPLAINT

## CLASS ACTION ALLEGATIONS

9.     <u>Class Definition.</u>  Plaintiff brings this lawsuit as a class action pursuant to Fed. R. Civ. P. 23.  Plaintiff seeks to represent the following classes:

A.     The "Nationwide Class" consists of: "All persons (including natural persons and business entities) anywhere in the United States who, during the applicable statute of limitations, entered into a merchant cash advance transaction with defendant pursuant to a Purchase Agreement or similar agreement containing a California choice-of-law clause."

B.     The "California Class" consists of: "All persons (including natural persons or business entities) in the State of California who, during the applicable statute of limitations, entered into a merchant cash advance transaction with defendant."

10.     <u>Numerosity.</u>  Plaintiff alleges on information and belief that each class consists of over 100 members.

11.     <u>Ascertainable Classes.</u>  The members of each class may be ascertained from defendant's business records.

12.     <u>Common Questions of Fact or Law.</u>  This lawsuit is suitable for class treatment because common questions of fact and law predominate over any individual issues.  Common questions include but are not limited to: (1) whether the California choice-of-law clause that defendant has included in the Agreement is enforceable as to Nationwide Class members; (2) whether defendant's merchant cash advance transactions are loans under California law; (3) whether defendant is licensed or otherwise authorized to make loans in the State of California; (4) whether the loans are subject to California's usury laws; (5) whether defendant has engaged in unlawful, unfair or fraudulent business acts or practices; and (6) the appropriate remedies for defendant's conduct.

13.     <u>Typicality and Adequacy.</u>  Plaintiff's claims are typical of the claims of members of each class.  Plaintiff will fairly and adequately protect the interests of

4

1  the other class members and has no interests that are adverse to the class members.

2      14.    Superiority.  A class action is superior to other means for the fair and

3  efficient adjudication of this controversy.   Class treatment will permit a large

4  number of similarly situated persons to prosecute their common claims in a single

5  forum simultaneously, efficiently, and without unnecessary duplication of effort or

6  expense.  Class treatment will also avoid the possibility of inconsistent judgments.

7      15.    Defendant Has Acted on Grounds Generally Applicable to the Classes.

8  Defendant has acted on grounds that are generally applicable to each class, thereby

9  making appropriate final injunctive relief or corresponding declarative relief with

10  respect to each class as a whole.

11                          FIRST CAUSE OF ACTION

12                                 (Usury)

13                  (By the Nationwide Class and the California Class)

14      16.    Plaintiff incorporates the preceding paragraphs as though fully set forth

15  herein.

16      17.    The Agreements entered into between defendant and Nationwide Class

17  and California Class members, including plaintiff, contain a California choice-of-

18  law clause.    The merchant cash advance transactions memorialized in the

19  Agreements were loans under California law.

20      18.    The annual interest rate on the merchant cash advance transactions

21  entered into between defendant and the Nationwide Class and California Class

22  members, including plaintiff, exceeded the interest rate limit established under

23  Article XV, Section 1(2) of the California Constitution.

24      19.    The principal amount of the merchant cash advances plus the

25  applicable finance charges were absolutely repayable by the Nationwide Class and

26  the California Class members, including plaintiff.

27      20.    Defendant had a willful intent to enter into usurious transactions with

28  the Nationwide Class and California Class members, including plaintiff.

21.    Pursuant to Cal. Uncodified Initiative Measures and Statutes 1919-1, Section 3, plaintiff and the Nationwide Class and California Class members are entitled to three times the interest paid on the usurious transactions, in an amount to be proved at trial.

22.    Defendant's acts were willful, malicious, oppressive, and done in conscious disregard of the rights of plaintiff and the Nationwide Class and California Class members, entitling them to an award of punitive damages, in an amount to be proved at trial.

## SECOND CAUSE OF ACTION

(Violation of Cal. Business & Prof. Code § 17200 et seq.)

(By the Nationwide Class and the California Class)

23.    Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

24.    By making illegal loans to plaintiff and the Nationwide Class and California Class members, defendant has engaged in unlawful, unfair or fraudulent business acts or practices in violation of Cal. Bus. & Prof. Code § 17200 et seq.

25.    Plaintiff has suffered injury in fact and lost money as a result of defendant's acts of unfair competition.

26.    Pursuant to Cal. Bus. & Prof. Code § 17203, plaintiff and the Nationwide Class and California Class members are entitled to an order: (1) requiring defendant make restitution to plaintiff and the Nationwide Class and California Class members; (2) cancelling any indebtedness owed by plaintiff and the Nationwide Class and California Class members; (3) cancelling any UCC-1 financing statements filed with respect to plaintiff and the Nationwide Class and California Class members; (4) cancelling any personal guarantees executed by plaintiff and the Nationwide Class and California Class members; and (5) enjoining defendant from making illegal loans.

## THIRD CAUSE OF ACTION

### (Money Had and Received)

### (By the Nationwide Class and the California Class)

27.   Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

28.   Defendant has received money in the form of usurious interest that is the property of plaintiff and the Nationwide Class and California Subclass members. In equity and good conscience, defendant must restore that money to plaintiff and the Nationwide Class and California Class members.

## FOURTH CAUSE OF ACTION

### (Declaratory Relief)

### (By the Nationwide Class and the California Subclass)

29.   Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

30.   Plaintiff contends that the following provisions of the Agreement are unenforceable because they are unconscionable and contrary to California public policy:

31.   Limitation of Remedies.  Section 5.05 of the Agreement (incorporated by reference into the personal guarantee) purports to limit plaintiff's remedies.  This provision is unconscionable.  The Agreement is a contract of adhesion, which is presented to borrowers on a take-it-or-leave-it basis, without any meaningful opportunity for negotiation.  As compared to its borrowers, including plaintiff, defendant has vastly superior bargaining power.  Furthermore, the provision is substantively unfair; it lacks mutuality in that the borrower's remedies are limited, whereas defendant's remedies are not.

32.   Class Action Waiver.  Section 5.04 of the Agreement (incorporated by reference into the personal guarantee) purports to bar plaintiff from pursuing her claims against defendant as part of a class action or private attorney general action.

1  This provision is unconscionable.  As alleged above, the Agreement is a contract of
2  adhesion, which is presented to borrowers on a take-it-or-leave-it basis, without any
3  meaningful opportunity for negotiation.  As compared to its borrowers, including
4  plaintiff, defendant has vastly superior bargaining power.  Furthermore, the class
5  action waiver is substantively unfair.  Disputes over the interest charged on each
6  loans involve relatively small amounts of damages.  Consequently, it would be
7  difficult for a borrower to hire an attorney to recover those damages in an individual
8  action.  Defendant's purpose in requiring borrowers to agree to the class action
9  waiver is to deny them a realistic opportunity to challenge the usurious nature of the
10 loans, as part of an overall scheme to cheat a large number of borrowers out of
11 individually small sums of money.

12     33.   <u>Jury Trial Waiver.</u>  Section 5.04 of the Agreement (incorporated by
13 reference into the personal guarantee) purports to waive the right to trial by jury.
14 This provision is unconscionable.  As alleged above, the Agreement is a contract of
15 adhesion, which is presented to borrowers on a take-it-or-leave-it basis, without any
16 meaningful opportunity for negotiation.  As compared to their borrowers, including
17 plaintiff, defendant has vastly superior bargaining power.  Furthermore, the
18 provision is substantively unconscionable because the jury trial waiver offers no
19 benefit to the borrowers and is one-sided because the borrowers received nothing in
20 exchange for agreeing to waive a trial by jury.

21     34.   Plaintiff is informed and believes that defendant contends that the
22 above-referenced provisions are enforceable.  Consequently, a dispute has arisen
23 and now exists between plaintiff and defendant, entitling plaintiff to a declaratory
24 judgment regarding the enforceability of these provisions.

PRAYER

26     WHEREFORE, plaintiff prays for judgment against defendant as follows:

27     1.   For compensatory damages according to proof;

28     2.   For punitive damages according to proof;

8

3.  For restitution and injunctive relief as prayed for herein;

4.  For declaratory relief as prayed for herein;

5.  For pre-judgment interest;

6.  For reasonable attorneys' fees and costs of suit; and

7.  For such other relief as the Court deems proper.

Dated: June 16, 2011             DOSTART CLAPP & COVENEY, LLP


_____
JAMES F. CLAPP
Attorneys for Plaintiff

442725.1

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all causes of action for which a jury is permitted.

Dated: June 16, 2011             DOSTART CLAPP & COVENEY, LLP


_____
JAMES F. CLAPP
Attorneys for Plaintiff

CLASS ACTION COMPLAINT

EXHIBIT 1

# PURCHASE AGREEMENT

This Purchase Agreement ("Agreement") is made effective as of 7/2/2010 (the "Effective Date") by and between Merchant Capital Source, LLC, a California limited liability company ("MCS"),  Rita's Cafe dba Rita's Cafe (Located at                                        ), a California Sole Proprietorship ("Merchant"), and, with respect to the applicable provisions of this Agreement, Rita Pimental ("Owner").

WHEREAS, MCS provides financing to qualified merchant businesses by purchasing a percentage of Merchant's future payment processing receivables and Merchant desires to sell certain future payment processing receivables to MCS for cash based on the terms and conditions set forth herein.

**See paragraphs 2.02, 2.03 and 2.05 for an explanation of the Guaranteed Obligations whereby in the event of a breach of the Guaranteed Obligations that the individuals that sign this Agreement will be personally liable under this Agreement to repay the obligations of the Merchant. The following all constitute a breach of the Agreement that could subject the individual signers of this document to personal liability (please see sections 2.02, 2.03 and 2.05 for a full list of these provisions):**

| | |
|---|---|
| **-Change Payment Processors** | **-Add a Payment Processor** |
| **-Sell the Business** | **-Sell Any Future Payment Receivables** |
| **-Take Another Cash Advance** | |

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## SECTION ONE - PURCHASE AND SALE OF FUTURE RESIDUALS

1.01.  MCS agrees to purchase, and Merchant agrees to sell to MCS, **19%** ("Percentage") of each of Merchant's future payment processing receivables ("Future Receivables")  due to Merchant from Merchant's payment processor ("Processor") until MCS has irrevocably received the aggregate sum of **$199,005** (the "Target Amount") from Merchant. Subject to Section 1.03 below, MCS agrees to pay Merchant **$150,000** (the "Purchase Price") for such Percentage of the Future Receivables. Merchant hereby assigns, sells and transfers to MCS all of its right, title and interest in such Percentage of the Future Receivables to MCS. To the extent that MCS consents to Merchant paying MCS via ACH payments as authorized by the ACH authorization form attached hereto as Exhibit A, the term Processor as used in section 1 of this Agreement shall also mean MCS. Merchant further agrees that MCS will charge a $250 administrative fee to cover MCS' costs in connection with the purchase of the Percentage of the Future Receivables which MCS may deduct such amount from the Purchase Price.

1.02.  From the Effective Date until the date that MCS receives payment in full of the Target Amount, Merchant agrees to authorize, and hereby irrevocably does authorize and instruct, the Processor to pay directly to MCS (rather than the Merchant) the amount equal to (i) all of Merchant's gross daily payment processing receipts ("Daily Receipts"), multiplied by (ii) the Percentage. Merchant further agrees that it shall be responsible for all charge-backs and other amounts that are deducted by the Processor or otherwise from the Merchant's payment processing receipts, and the Daily Receipts will be calculated prior to deducting any charged-back or other amounts.

1.03.  Upon the execution of this Agreement by Merchant and MCS, but before MCS' payment of the Purchase Price, Merchant agrees to allow MCS to instruct the Processor to conduct a processing trial for 2 business days to ensure that Merchant's Daily Receipts are being properly processed and that the Percentage of the Future Receivables is being properly remitted to MCS (the "Trial Period").

MCS agrees to make a determination to purchase, or not, the Percentage of the Future Receivables promptly after the end of the Trial Period.  If MCS decides to purchase the Percentage of the Future Receivables, then all of the monies received by MCS in connection with the Trial Period shall be applied toward the Target Amount.  Nothing herein shall create an obligation of MCS to purchase the Percentage of the Future Receivables until the payment by MCS of the Purchase Price, and MCS expressly reserves the right not to purchase such Percentage of the Future Receivables and not to pay the Purchase Price.  If MCS decides not to purchase the Percentage of the Future Receivables, then MCS is not obligated to pay the Purchase Price, and this Agreement shall be immediately terminated and be of no further force or effect.  In such event, all monies received from Merchant during the Trial Period will be returned to the Merchant.

1.04.  In the event that the amount of cash remitted to MCS by the Processor pursuant to this Agreement exceeds the Target Amount (such amount being the "Excess Amount") by more than $30.00, MCS agrees to pay such Excess Amount to Merchant within 45 days after MCS receives the last payment from the Processor towards the Target Amount.  In the event that the Excess Amount is less than $30.00, MCS shall keep any such Excess Amount.  Merchant agrees that MCS has no obligation to take any action with respect to any Excess Amount until such amount is actually remitted by the Processor to MCS.

## SECTION TWO - REPRESENTATIONS AND WARRANTIES

2.01.  Prior to MCS paying the Purchase Price to Merchant, Merchant agrees to execute a processing services agreement with the Processor (the "Processing Agreement") in a form acceptable to MCS to provide exclusive payment processing services for Merchant during the Term of this Agreement, and to irrevocably instruct and authorize the Processor to pay the cash attributable to Percentage of the Future Receivables to MCS in accordance with this Agreement.  Merchant agrees that it will not, cancel the Processing Agreement, or, without approval of MCS which approval may be withheld in MCS' sole discretion, modify the Processing Agreement if it adversely affects the amount or procedure by which monies are payable to Merchant or in any way affects the rights of MCS under this Agreement.  Merchant further agrees not to use any other payment processing agent other than the Processor that has been approved by MCS, until MCS has received complete payment of the Target Amount.

2.02.  Merchant and Owner agree to (i) exclusively use the Processor to process all of Merchant's payment transactions, (ii) conduct and maintain Merchant's business according to past custom and practice, (iii) not to discourage the use of credit cards as a means of payment for Merchant's products and/or services, (iv) not to permit any event to occur which could have an adverse effect on the use, acceptance or authorization of credit cards as a means of payment for Merchant's products and/or services, (v) not to change Merchant's relationship, contractual or otherwise, with the Processor in a way that would be adverse to MCS, (vi) not sell, dispose, lien, encumber, pledge, convey or otherwise transfer Merchant's business or assets or any ownership interests in its business without (x) the express written consent of MCS, and (y) the written assumption of all Merchant obligations set forth in this Agreement.

2.03  Merchant and Owner represent and warrant to MCS that all of the information and supplemental materials provided to MCS during the application process, the Merchant application ("Application") and in connection with the Trial Period are valid, true, complete accurate and do not contain any omissions or misstatements.

2.04  Merchant and Owner acknowledge and agree that an investigative report, including a credit check with recognized credit reporting agency(s), may be conducted in connection with this Agreement and/or the Application.  Merchant and each Owner authorize MCS and its agents and representatives to (i) initiate such reports, investigations and/or credit checks, (ii) investigate any

statements made or data received from or about Merchant and/or its Owners, and (iii) contact any references given by Merchant or its Owners. Merchant and each Owner also agrees to execute any consent forms reasonably necessary for MCS to complete such credit checks and inquiries. In addition, Merchant agrees that the Processor may provide MCS with Merchant's historical payment processing statements and information without the prior consent of Merchant.

2.05 Merchant and Owner warrant, represent and covenant that (i) Merchant has been operating Merchant's business at Merchant's present location for at least the last 9 consecutive months prior to the Effective Date, (ii) Merchant will not change Merchant's name or the location of Merchant's business during the Term, (iii) all payment receipts to be processed through the Processor and all Future Receivables are solely owned by Merchant and shall not assigned, conveyed or encumbered except for the sale to MCS as provided for herein, (iv) all payment receipts and all Future Receivables are not subject to any liens or encumbrances, are valid, true and correct and enforceable obligations of the parties thereto including the customer and the bank that issued the related credit card, (v) he/it is not aware of claims or events or circumstances that would cause any of the Future Receivables to not be fully collectible, (vi) Merchant possesses and is in compliance with all permits, licenses, approvals, consents and other authorizations necessary to conduct Merchant's business, (vii) Merchant is in compliance with all applicable federal, state and local laws and regulations, (viii) Merchant will maintain insurance in such amounts and against such risks as are consistent with past custom and practice, (ix) Merchant is not the subject of any litigation or claims asserted or threatened by any third party except for claims arising in the ordinary course of business that are covered by adequate insurance or which claims alleged do not exceed $15,000, (x) Merchant will not cause the payment transactions processed during the Trial Period to not be representative of the payment transactions that occur in Merchant's ordinary course of business, (xi) he/it knows of no fact or circumstance that would cause the Future Receivables to decrease in amount, quality or collectibility other than due to general economic conditions, (xii) until the Target Amount is received in full by MCS, the Future Receivables shall be incurred in the ordinary course of Merchant's business, and Merchant shall take no action or fail to take any action that will cause the Future Receivables or the collectibility of the Percentage of Future Receivables to be adversely affected.

## SECTION THREE - REMEDIES OF MCS

3.01. Right of Access. In order to ensure that Merchant is complying with the terms of this Agreement MCS shall have the right to (i) enter and stay on the premises of the Merchant's business, (ii) Merchant shall provide access to its employees, records and all other items as requested by MCS and (iii) have Merchant provide information about it business operations, banking relationships, vendors, landlord and other information to allow MCS to interview any relevant parties. Pursuant to this provision, Merchant hereby grants the MCS express access to the property of Merchant, and hereby agrees that in the event the MCS enters onto the property of Merchant pursuant to this Agreement, such access shall not constitute trespass for criminal or civil purposes. MCS further reserves the right to obtain the cooperation of any governmental agency, legal enforcement agency, or other administrative agency in obtaining access to Merchant's property as provided herein.

3.02. Merchant shall deliver to MCS and Processor such information and documents as reasonably requested by MCS or Processor from time to time with respect to or relating to any Future Receivables and/or the conduct of Merchant's business including its financial statements. Merchant agrees to execute such documents as are reasonably necessary to effectuate the provisions of this Agreement and the Processing Agreement. Further, in the event MCS is ever unable to collect the Percentage of Future Receivables as set forth in Section 1, Merchant agrees to (i) change its primary deposit account to a bank or financial institution of MCS' discretion to enable MCS to continue to collect the Percentage of the Future Receivables as set forth herein, or (ii) authorize MCS to debit, on a daily basis via an ACH transaction, the Percentage of the Future Receivables deposited in its bank account by

the Processor until the Merchant's obligations under this Agreement are complete.  By executing this Agreement, Merchant hereby authorizes MCS to conduct such ACH transactions if MCS is unable to collect the Percentage of Future Receivables as set forth in Section 1.  MCS will deduct automatically all such monies within a time frame left to the full and singular discretion of MCS, regardless of the status of the Merchant's bank account.

3.03.  Preservation of Equipment.  MCS shall have the right at any time to enter onto any of the property of Merchant to determine Merchant's compliance with the terms of this Agreement, to take possession of any payment processing equipment ("Equipment") and to inspect and make an inventory of the Equipment.  Merchant shall use any and all means necessary to ensure that Equipment entrusted to Merchant pursuant to this Agreement is preserved, safeguarded, and kept in its original condition free of defects and/or malfunctions.  Merchant further agrees that it shall not, in any event, remove the Equipment from the premises or property to which the Equipment was originally delivered by MCS, for any purpose whatsoever.

3.04.  Sale.  The Purchase Price paid by MCS reflects a purchase of the Percentage of the Future Receivables and is not intended to be nor shall it be construed as a loan from MCS to Merchant.  In addition, Merchant agrees to be responsible for any sales or excise taxes (or other related tax) arising out of the transactions contemplated by this Agreement, and will indemnify MCS for any liabilities, fees, costs, taxes or otherwise arising from such liability.

3.05.  Security Interest.  In order to secure the obligations of Merchant under this Agreement and any amendments or changes thereto, Merchant hereby grants to MCS a continuing first priority lien and security interest in all of the Future Receivables of Merchant, all of Merchant's accounts receivable and other Accounts as defined under the California Uniform Commercial Code, and all of the proceeds thereof (all of the preceding, the "Future Receivable Collateral"), and in all of the other assets of Merchant, including, but not limited to, all chattel paper, all documents, all equipment, all fixtures, all general intangibles, all instruments, all inventory, all investment property, and all proceeds and products thereof, as each is defined under the California Uniform Commercial Code (all of the preceding, including, without limitation, the Future Receivable Collateral, are collectively referred to as the ("Collateral")).  Any UCC-1 financing statements filed by MCS with respect to the Future Receivables may state that the sale of the Percentage of the Future Receivables are intended to be a sale and not an assignment for security.  If there is an Event of Default, MCS may exercise any one or more of the rights and remedies granted to it pursuant to this Agreement or given to a secured party under applicable law, including but not limited to the California version of the Uniform Commercial Code, as such laws may be amended from time to time, including but not limited to the right to take possession and sell, lease or otherwise dispose of the Collateral and, at its option, operate, use or exercise any rights of ownership pertaining to the Collateral as MCS deems necessary to preserve the value and receive the benefits of the Collateral.  Upon the occurrence of an Event of Default, MCS may, so far as Merchant can give authority therefore, enter upon any premises on which the Collateral or any part thereof may be situated and take possession of and remove the same therefrom and gives permission to MCS to conduct a sale of any or all of the Collateral, which sale may be conducted on any real property owned or leased by Merchant without charge or interference by Merchant.  Merchant waives all claims for damages by reason of any seizure, or repossession of the Collateral under the terms of this Agreement provided that MCS' actions are permissible under the California Uniform Commercial Code (or any other applicable law).  Merchant hereby appoints MCS as its attorney in fact to execute all documents on behalf of Merchant and take all actions on behalf of Merchant to effectuate the provisions of this Agreement.  The Merchant will pay or reimburse MCS on demand for all reasonable out-of-pocket expenses paid or incurred by the Secured Party (including attorneys' fees) incurred from time to time, in connection with the enforcement of this Agreement and the security interest granted above.

**SECTION FOUR - TERM AND TERMINATION**

4.01. <u>Term</u>. This Agreement shall commence on the Effective Date, and unless terminated earlier as set forth in this Section 4 or in Section 1.3 above, shall end on the date that MCS receives complete payment of the Target Amount (the "Term"). This Agreement may only be terminated as set forth in Section 1.3 and in this Section 4. This Agreement may only be terminated by Merchant upon its complete payment to MCS of the Target Amount. Merchant may not terminate this Agreement under any other circumstances.

4.02. <u>Termination for Cause</u>. This Agreement may be terminated by MCS immediately upon the occurrence of any of the following events (each, an "Event of Default"):

    (a) Merchant's or Owner's breach of any of the terms, conditions, covenants, representations or warranties set forth this Agreement or any agreements with the Processor; or

    (b) If Merchant ceases to do business, or otherwise terminates or begins to wind down its business operations; or

    (c) If Merchant fails to promptly secure or renew any license, registration, permit, authorization or approval for the conduct of its business or if any such license, registration, permit, authorization or approval is revoked or suspended and the foregoing has a adverse effect on Merchant's ability to perform its obligations hereunder; or

    (d) If Merchant defaults or becomes delinquent in any of its facility leases, or otherwise defaults under any other loan, extension of credit, line of credit, credit facility or other agreement with a vendor, supplier or otherwise; or

    (e) If any creditor of Merchant forecloses or initiates a foreclosure or other proceeding, by repossession or otherwise, against any of Merchant's assets; or

    (f) If any event occurs which has or reasonably could have a adverse effect on Merchant or its business that could reasonably impair its ability to conduct its business, process credit cards or otherwise satisfy its obligations under this Agreement, including but not limited to the Processor's suspension, interruption or termination of processing services for Merchant; or

    (g) If Merchant becomes insolvent or seeks protection under any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding, or if any such proceeding is instituted against the other; or

    (h) If more than 10% of any of the Daily Receipts in any month during the Term are subject to charge-backs, or are otherwise determined to be invalid or uncollectible for any reason by the Processor, the bank that issued the credit or MCS; or

    (i) If the business or substantially all of the assets of the Merchant are sold, assigned, transferred or conveyed to any person or entity for any reason including without limitation, the foreclosure of a security interest in the Merchant's assets; or

    (j) MCS' discovery of any inaccuracies or omissions in the Application or in the other information provided to MCS by Merchant or Owner; or

    (k) Merchant uses a credit card terminal processing through the Processor or stop accepting credit cards; or

    (l) Merchant has an outstanding merchant finance agreement with any competitor of MCS.

4.03. <u>Effect of Termination</u>. Upon any termination of this Agreement or Event of Default, Merchant shall, within 3 business days of such termination, pay MCS the Target Amount less monies already received by MCS from the Future Receivables (collectively, the "Balance"). If Merchant fails to pay MCS the Balance within such 3 day period, Merchant agrees that MCS may automatically debit the

Balance from its bank account via the automated clearing house system or by wire transfer.  In the event that MCS is unable for any reason to debit the Merchant's bank account as set forth above, MCS will collect 100% of all Daily Receipts that are otherwise payable to Merchant until the Balance has been fully paid to MCS.  Notwithstanding the foregoing, MCS may exercise any and all other available rights and remedies available at law and in equity. All Merchant and Owner obligations and covenants including all obligations of Owner under the below Guaranty shall survive the termination of this Agreement.

## SECTION FIVE  - GENERAL PROVISIONS

5.01.  Merchant agrees to indemnify, defend, and hold harmless MCS, its employees or agents from and against any loss, liability, damage, penalty or expense (including attorneys' fees, expert witness fees and cost of defense) they may suffer or incur as a result of  (i) any failure by Merchant or any employee, agent or affiliate of Merchant to comply with the terms of this Agreement; (ii) any warranty or representation made by Merchant being false or misleading; or (iii) any negligence on the part of Merchant.

5.02.  This Agreement will bind and inure to the benefit of each party's permitted successors and assigns.  Merchant may not assign this Agreement without the written consent of MCS.  MCS may assign this Agreement in its sole discretion without the written consent of Merchant.  This Agreement sets forth the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein, and supersedes all prior agreements, promises, covenants, arrangements, communications, representations or warranties, whether oral or written, by any officer, partner, employee or representative of any party hereto. No amendment or modification to this Agreement, nor any waiver of any rights hereunder, shall be effective unless assented to in writing by both parties.

5.03.  This Agreement shall be governed by and construed in accordance with the laws of the State of California (irrespective of its choice of law principles).  The parties hereby agree that any suit to enforce any provision of this Agreement or arising out of or based upon this Agreement or the business relationship between the parties hereto shall be brought in federal or state court in Orange County, California.  In any action arising from the alleged breach of this Agreement, or to enforce this Agreement, the final prevailing party will recover its reasonable attorneys' fees, costs and expenses.

5.04.  All parties to this Agreement hereby waive trial by jury in any action, proceeding, suit, counter-claim, cross-claim or third party claim brought by any of the parties hereto on any matters whatsoever arising out of or in any way related to or connected with this Agreement.  No claim may be brought under this Agreement as a class action or as a private attorney general.  All parties waive any right they have to act as a class representative or participate as a member of a class with respect to any action, proceeding, suit, counter-claim, cross-claim or third party claim brought by any of the parties hereto on any matters whatsoever arising out of or in any way related to or connected with this Agreement

5.05.  MCS disclaims all warranties, express or implied, including but not limited to the implied warranties of fitness for a particular purpose and merchantability.  MCS shall have no liability in contract, tort, negligence or otherwise to Merchant, Owner or any other third party arising out of any of products or services provided under this Agreement.  MCS shall not be liable to Merchant, Owner or any third party for any liquidated, indirect, consequential, exemplary or incidental damages (including damages for loss of business profits, business interruption, loss of business information, and the like) arising out of this Agreement even if MCS has been advised of the possibility of such damages. Under no circumstances shall MCS' total liability to Merchant, Owner or any third party arising out of or related to this Agreement exceed one thousand dollars ($1,000.00) regardless of whether any action or claim is based on warranty, contract, tort or otherwise.  Merchant agrees that MCS shall not be liable for the acts or omissions of the Processor.

5.06.  The failure of either party to this Agreement to object to or to take affirmative action with respect to any conduct of the other which is in violation of the terms of this Agreement, shall not be construed as a waiver of that conduct or any future breach or subsequent wrongful conduct.  If any part, term or provision of this Agreement is declared and determined by any court or arbitrator to be illegal or invalid, such declaration and determination shall not effect the validity of the remaining parts, terms or provisions.  The various headings in this Agreement are inserted for convenience only and shall not affect this Agreement or any portion thereof.  This Agreement may be executed in two or more counter-parts and/or by fax, each of which shall be deemed an original, all of which together shall constitute one and the same instrument. The signatures to this Agreement may be evidenced by facsimile copies reflecting the party's signature hereto, and any such facsimile copy shall be sufficient to evidence the signature of such party as if it were an original signature.

IN WITNESS THEREOF, this agreement has been duly executed by the parties hereto, effective as of the date and year first above written.

**Merchant Capital Source, LLC**

By: _____

Name/Title: _____

**Merchant**
Rita's Cafe

By: _____

Name:  Rita Pimental
Title:  Owner

**Shareholder/Owner\***

By: _____

Name: Rita Pimental
Title: Owner

SSN#: _____

\* as to the provisions above which reference Shareholder/Owner and as to the Guaranty below.

The undersigned Owner(s) (collectively, "Guarantor"), who are the owners of the Merchant, hereby jointly and severally unconditionally and irrevocably guarantee to the performance by the Merchant of sections 2.02, 2.03 and 2.05 of this Agreement (the obligations of those sections are collectively referred to herein as the "Guaranteed Obligations") and the immediate payment of all monies owed to MCS by Merchant under the Agreement in the event of breach of the Guaranteed Obligations by Merchant, whether or not the Guaranteed Obligations are found to be invalid, illegal or unenforceable, this being a guaranty of payment and not a guaranty of collection. This Guaranty shall remain in full force and effect notwithstanding the fact that, at any particular time, no Guaranteed Obligations may be outstanding. All of the terms of Section 5 of the above Agreement, including Owner's agreement that the exclusive jurisdiction for all disputes arising out of this Guaranty shall be Orange County, California, are hereby incorporated herein by reference except that reference to "Agreement" in such Sections shall mean this Guaranty. GUARANTOR WAIVES ANY AND ALL SURETYSHIP DEFENSES, WHETHER ARISING BY CONTRACT, STATUTE OR BY OPERATION OF LAW. Guarantor agrees to pay all costs and expenses, including reasonable attorneys' fees incurred by MCS, to enforce the provisions of this Guaranty, as determined by the court. In addition, each Guarantor agrees to pay on demand all damages incurred by MCS arising out of a breach of any of the Merchant covenants of Merchant that are listed below, including, without limitation, the full amount of all monetary obligations owed by Merchant to MCS under the Agreement. Guarantor waives all protection afforded it under California law or other applicable law and any related rights to revoke this Guaranty as to future Guaranteed Obligations.

Dated this _____ day of _____, 200_____.

Guarantor:

By: _____

Name: Rita Pimental

SSN#: _____

Address:



Witnessed by: _____

Name: _____

EXHIBIT 2

# MERCHANT CAPITAL SOURCE, LLC --- PURCHASE AGREEMENT

This Purchase Agreement (together with the below Guaranty, the "Agreement") is made effective as of April 7, 2008 (the "Effective Date") by and between Merchant Capital Source, LLC, a California limited liability company ("MCS"),  Rita Pimental dba Rita's Cafe , located at 427 W. Harris Street, 1134 5th Street and 107 Wabash St a Sole Proprietorship("Merchant"), and,  with respect to the applicable provisions of this Agreement, Rita Pimental ("Shareholder/Owner).

A.  MCS provides financing to qualified merchant businesses by purchasing a percentage of Merchant's future credit card processing receivables.
B.  Merchant desires to sell certain future credit card processing receivables to MCS for cash based on the terms and conditions set forth herein.

NOW, THEREFORE, BE IT RESOLVED, that in consideration of the mutual promises and conditions and premises contained herein and above, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## 1.  Purchase and Sale of Future Receivables

1.1 MCS agrees to purchase, and Merchant agrees to sell to MCS, 20% (the "**Percentage**") of each of Merchant's future credit card processing receivables (the "**Future Receivables**") due to Merchant from First Data Corporation d/b/a Humboldt Merchant Services  or another credit card processor acceptable to MCS (collectively, the "**Processor**") until MCS has irrevocably received the aggregate sum of $102,997 (the "**Target Amount**") from Merchant.  Subject to Section 1.3 below, MCS agrees to pay Merchant $76,000 (the "Purchase Price") via wire transfer (or other reasonable means as determined by MCS) for such Percentage of the Future Receivables.  Merchant hereby assigns, sells and transfers to MCS all of its right, title and interest in such Percentage of the Future Receivables to MCS.  Merchant further agrees that MCS will charge a $50 administrative fee to cover the costs of the wire transfer, credit check and document preparation fees in connection with the purchase of the Percentage of the Future Receivables.  Merchant agrees that MCS may deduct such amount from the Purchase Price.

1.2 From the Effective Date until the date that MCS receives payment in full of the Target Amount, Merchant agrees to authorize, and hereby irrevocably does authorize and instruct, the Processor to pay directly to MCS (rather than the Merchant) the amount equal to (i) all of Merchant's gross daily credit card processing receipts ("Daily Receipts"), multiplied by (ii) the Percentage.  Merchant further agrees that it shall be responsible for all charge-backs and other amounts that are deducted by the Processor or otherwise from the Merchant's credit card processing receipts, and the Daily Receipts will be calculated prior to deducting any charged-back or other amounts.

1.3 Upon the execution of this Agreement by Merchant and MCS, but before MCS's payment of the Purchase Price, Merchant agrees to allow MCS to instruct the Processor to conduct a processing trial to ensure that Merchant's Daily Receipts are being properly processed and that the Percentage of the Future Receivables is being properly remitted to MCS (the "Trial Period").  The Trial Period shall be for two business days.  MCS agrees

1

to make a determination to purchase, or not, the Percentage of the Future Receivables promptly after the end of the Trial Period.  If MCS decides to purchase the Percentage of the Future Receivables, then all of the monies received by MCS in connection with the Trial Period shall be applied toward the Target Amount.  Nothing herein shall create an obligation of MCS to purchase the Percentage of the Future Receivables until the payment by MCS of the Purchase Price, and MCS expressly reserves the right not to purchase such Percentage of the Future Receivables and not to pay the Purchase Price.  If MCS decides not to purchase the Percentage of the Future Receivables, then MCS is not obligated to pay the Purchase Price, and this Agreement shall be immediately terminated and be of no further force or effect.  In such event, all monies received from Merchant during the Trial Period will be returned to the Merchant.

1.4 In the event that the amount of cash remitted to MCS by the Processor pursuant to this Agreement exceeds the Target Amount (such amount being the "Excess Amount") by more than $30.00, MCS agrees to pay such Excess Amount to Merchant within 45 days after MCS receives the last payment from the Processor towards the Target Amount. In the event that the Excess Amount is less than $30.00, MCS agrees to pay such Excess Amount within 30 days after it receives a written request from Merchant for such Excess Amount, and provided that such request is received by MCS within three months from the date MCS received payment in full for the Target Amount.  Merchant agrees that MCS has no obligation to take any action with respect to any Excess Amount until such amount is actually remitted by the Processor to MCS.

## 2.   **Merchant  and  Owner/Shareholder  Obligations,  Covenants,  Representations, and Warranties**

2.1 Prior to MCS paying the Purchase Price to Merchant, Merchant agrees to execute a processing services agreement with the Processor (the "Processing Agreement") in a form acceptable to MCS to provide exclusive credit card processing services for Merchant during the Term of this Agreement, and to irrevocably instruct and authorize the Processor to pay the cash attributable to Percentage of the Future Receivables to MCS in accordance with this Agreement.  Merchant agrees that it will not, cancel the Processing Agreement, or, without approval of MCS which approval may be withheld in MCS's sole discretion, modify the Processing Agreement if it adversely affects the amount or procedure by which monies are payable to Merchant or in any way affects the rights of MCS under this Agreement.  Merchant further agrees not to use any other credit card processing agent other than the Processor that has been approved by MCS, until MCS has received complete payment of the Target Amount.

2.2 Merchant agrees to (i) exclusively use the Processor to process all of its credit card transactions, (ii) conduct and maintain its business according to past custom and practice, (iii) not to discourage the use of credit cards as a means of payment for its products and/or services, (iv) not to permit any event to occur which could have an adverse effect on the use, acceptance or authorization of credit cards as a means of payment for its products and/or services, (v) not to change its relationship, contractual or otherwise, with the Processor in a way that would be adverse to MCS, (vi) not sell, dispose, lien, encumber, pledge, convey or otherwise transfer its business or assets or any ownership interests in its business without (x) the express written consent of MCS, and (y) the written assumption of all Merchant obligations set forth in this Agreement.

2

2.3 Merchant and each Shareholder/Owner represent and warrant to MCS that all of the information and supplemental materials provided to MCS during the application process, the Merchant application (the "Application") and in connection with the Trial Period are valid, true, complete, and accurate. Merchant and Shareholder/Owner further represents that all information in the Application and provided during the Trial Period is accurate and complete, and such Application and other information regarding the Trial Period does not contain any omissions or misstatements.

2.4 Merchant and each Shareholder/Owner acknowledge and agree that an investigative report, including a credit check with recognized credit reporting agency(s), may be conducted in connection with this Agreement and/or the Application. Merchant and each Owner/Shareholder authorize MCS and its agents and representatives to (i) initiate such reports, investigations and/or credit checks, (ii) investigate any statements made or data received from or about Merchant and/or its Owners/Shareholders, and (iii) contact any references given by Merchant or its Owners/Shareholders. Merchant and each Owner/Shareholder also agrees to execute any consent forms reasonably necessary for MCS to complete such credit checks and inquiries. In addition, Merchant agrees that the Processor may provide MCS with Merchant's historical credit card processing statements and information without the prior consent of Merchant.

2.5 Merchant warrants, represents and covenants that (i) it has been operating its business at its present location for at least the last 12 consecutive months prior to the Effective Date, (ii) it will not change its name or the location of its business during the Term, (iii) all credit card receipts to be processed through the Processor and all Future Receivables are solely owned by Merchant and shall not assigned, conveyed or encumbered except for the sale to MCS as provided for herein, (iv) all credit card receipts and all Future Receivables are not subject to any liens or encumbrances, are valid, true and correct and enforceable obligations of the parties thereto including the customer and the bank that issued the related credit card, (v) it is not aware of claims or events or circumstances that would cause any of the Future Receivables to not be fully collectible, (vi) it possesses and is in compliance with all permits, licenses, approvals, consents and other authorizations necessary to conduct its business, (vii) it is in compliance with all applicable federal, state and local laws and regulations, (viii) it will maintain insurance in such amounts and against such risks as are consistent with past custom and practice, (ix) Merchant is not the subject of any litigation or claims asserted or threatened by any third party except for claims arising in the ordinary course of business that are covered by adequate insurance or which claims alleged do not exceed $15,000, (x) Merchant will not cause the credit card transactions processed during the Trial Period to not be representative of the credit card transactions that occur in Merchant's ordinary course of business, (xi) Merchant knows of no fact or circumstance that would cause the Future Receivables to decrease in amount, quality or collectibility other than due to general economic conditions, (xii) until the Target Amount is received in full by MCS, the Future Receivables shall be incurred in the ordinary course of Merchant's business, and Merchant shall take no action or fail to take any action that will cause the Future Receivables or the collectibility of the Percentage of Future Receivables to be adversely affected.

2.6 Merchant agrees to indemnify, defend, and hold harmless MCS and its managers, owners, agents, employees, members, and their respective successor and assigns from all liabilities, costs, obligations, damages, penalties, and claims, including reasonable

3

attorneys' fees and costs, incurred by such indemnified parties arising out of, or related to, a breach of any provision of this Agreement.

2.7 Merchant shall deliver to MCS and Processor such information and documents as reasonably requested by MCS or Processor from time to time with respect to or relating to any Future Receivables and/or the conduct of Merchant's business including its financial statements.  Merchant agrees to execute such documents as are reasonably necessary to effectuate the provisions of this Agreement and the Processing Agreement.  Further, in the event MCS is ever unable to collect the Percentage of Future Receivables as set forth in Section 1, Merchant agrees to (i) change its primary deposit account to a bank or financial institution of MCS's discretion to enable MCS to continue to collect the Percentage of the Future Receivables as set forth herein, or (ii) authorize MCS to debit, on a daily basis via an ACH transaction, the Percentage of the Future Receivables deposited in its bank account by the Processor until the Merchant's obligations under this Agreement are complete.  By executing this Agreement, Merchant hereby authorizes MCS to conduct such ACH transactions if MCS is unable to collect the Percentage of Future Receivables as set forth in Section 1.

2.8 Merchant agrees that MCS shall not be liable for the acts or omissions of the Processor.

## 3.   Term and Termination

3.1 Term.  This Agreement shall commence on the Effective Date, and unless terminated earlier as set forth in this Section 3 or in Section 1.3 above, shall end on the date that MCS receives complete payment of the Target Amount (the "Term").

3.2 Termination.  This Agreement may only be terminated as set forth in Section 1.3 and in this Section 3.2.

      3.2.1     Termination by Merchant.  This Agreement may only be terminated by Merchant upon its complete payment to MCS of the Target Amount.  Merchant may not terminate this Agreement under any other circumstances.

      3.2.2     Termination for Cause.  This Agreement may be terminated by MCS immediately upon the occurrence of any of the following events (each, an "Event of Default"):

      i.  Merchant's or Owner/Shareholder's breach of any of the terms, conditions, covenants, representations or warranties set forth this Agreement or any agreements with the Processor; or

      ii.  MCS's discovery of any inaccuracies or omissions in the Application or in the other information provided to MCS by Merchant or Shareholder/Owner; or

      iii.  If Merchant ceases to do business, or otherwise terminates or begins to wind down its business operations; or

      iv.  If Merchant fails to promptly secure or renew any license, registration, permit, authorization or approval for the conduct of its business or if any such license, registration, permit, authorization or approval is revoked or suspended

4

and the foregoing has a adverse effect on Merchant's ability to perform its obligations hereunder; or

    v.  If Merchant defaults or becomes delinquent in any of its facility leases, or otherwise defaults under any other loan, extension of credit, line of credit, credit facility or other agreement with a vendor, supplier or otherwise; or

    vi.  If any creditor of Merchant forecloses or initiates a foreclosure or other proceeding, by repossession or otherwise, against any of Merchant's assets; or

    vii.  If any event occurs which has or reasonably could have a adverse effect on Merchant or its business that could reasonably impair its ability to conduct its business, process credit cards or otherwise satisfy its obligations under this Agreement, including but not limited to the Processor's suspension, interruption or termination of processing services for Merchant; or

    viii.  If Merchant becomes insolvent or seeks protection under any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding, or if any such proceeding is instituted against the other; or

    ix.  If more than 10% of any of the Daily Receipts in any month during the Term are subject to charge-backs, or are otherwise determined to be invalid or uncollectible for any reason by the Processor, the bank that issued the credit or MCS.

    x.  If the business or substantially all of the assets of the Merchant are assigned, transferered or conveyed to any person or entity for any reason including without limitation, the foreclosure of a security interest in the Merchant's assets.

    3.2.3  <u>Effect of Termination</u>.  Upon any termination of this Agreement or Event of Default, Merchant shall, within 3 business days of such termination, pay MCS the Target Amount less monies already received by MCS from the Future Receivables (collectively, the **"Balance"**).  If Merchant fails to pay MCS the Balance within such 3 day period, Merchant agrees that MCS may automatically debit the Balance from its bank account via the automated clearing house system or by wire transfer.  In the event that MCS is unable for any reason to debit the Merchant's bank account as set forth above, MCS will collect 100% of all Daily Receipts that are otherwise payable to Merchant until the Balance has been fully paid to MCS.  Merchant hereby authorizes and instructs Processor to pay such amount to MCS as set forth in this Section 3.2.3 and Section 4.7. Notwithstanding the foregoing, MCS may exercise any and all other available rights and remedies available at law and in equity. All Merchant and Owner/Shareholder obligations and covenants including all obligations of Owner/Shareholder under the below Guaranty shall survive the termination of this Agreement.

**4.**  **<u>Miscellaneous</u>**.

4.1  <u>No Conflicts</u>.  Merchant and Owner/Shareholder each acknowledge and agree that they have the power and the authority to enter into this Agreement and to perform their respective obligations hereunder.  Merchant and each Owner/Shareholder have not entered into any other agreements that would conflict with the terms of this Agreement and, upon execution and delivery hereof, this Agreement shall constitute the valid and binding obligations of Merchant and the Owner/Shareholders,

enforceable in accordance with its terms. Merchant is qualified to do business in the state of its principal place of business and all other states where it operates.

4.2 <u>Assignment; Binding Effect; Time of the Essence</u>.  Merchant may not assign this Agreement without the prior written consent of MCS.  Any attempted assignment in violation of this Section 4.2 shall be void. This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective successors and assigns. Time is of the essence of each and every obligation set forth in this Agreement.

4.3 <u>Notices</u>.  Any notice or other communication required or permitted to be made or given to Merchant or Owner/Shareholder under this Agreement shall be deemed sufficiently made or given on the date of delivery if delivered in person, by facsimile, or by overnight commercial courier service with tracking capabilities with costs prepaid, or three (3) days after the date of mailing if sent by certified first class U.S. mail, return receipt requested and postage prepaid, at the address of Merchant set forth on the Application.

4.4 <u>Controlling Law/Venue for Disputes</u>.  This Agreement (including the below Guaranty) shall be governed by the internal laws of the State of California without regard to conflict of interest principles.  The parties, including Shareholder/Owner with respect to this Agreement and the Guaranty below, hereto submit to the personal jurisdiction of the federal and state courts of the State of California located in Orange County and waive any claim that an action or arbitration action is brought in an inconvenient forum, that the venue is improper, or that such courts cannot enforce this Agreement.

4.5 <u>Entire Agreement</u>. This Agreement (including the below Guaranty) contains the full and complete understanding of Merchant, Owner/Shareholder and MCS, and supersedes all prior agreements and understandings between the parties with respect to the entire subject matter hereof.  Only a written instrument signed by an authorized representative of each party may amend this Agreement.  This Agreement is the result of arm's length negotiations between the parties and shall be construed to have been drafted by all parties such that any ambiguities in this Agreement shall not be construed against any party.  This Agreement shall not constitute, give effect to, or otherwise imply, a joint venture, partnership, agency or formal business organization of any kind.  No waiver, delay or discharge by any party will be valid unless in writing and signed by an authorized representative of the party against which its enforcement is sought.  Neither the failure of any party to exercise any right of termination, nor the waiver of any default will constitute a waiver of the rights granted in the Agreement with respect to any subsequent or other default.  If any provision of this Agreement is declared invalid or otherwise unenforceable, the enforceability of the remaining provisions shall be unimpaired, and the parties shall replace the invalid or unenforceable provision with a valid and enforceable provision that reflects the original intentions of the parties as nearly as possible in accordance with applicable law.

4.6 <u>Headings</u>.  Section headings are for reference only and shall not affect the interpretation of this Agreement.

4.7 <u>Security Interest</u>.   In order to secure the obligations of Merchant under this Agreement and any amendments or changes thereto, Merchant hereby grants to MCS a continuing priority first lien security interest in all of the Future Receivables of Merchant, all of Merchant's accounts receivable and other Accounts as defined under the California Uniform Commercial Code, and all of the proceeds thereof (all of the

6

preceding, the "Future Receivable Collateral"), and in all  of the other assets of Merchant as described in **Exhibit A** attached hereto (all of the preceding, including, without limitation, the Future Receivable Collateral, are collectively referred to as the "Collateral" ). MCS's security interest in the Collateral shall attach to all such Collateral without further act on the part of MCS. MCS shall file a UCC-1 financing statement in order to perfect MCS' security interest in the  Future Receivable Collateral upon execution of this Agreement and such UCC-1 Financing statements may state that the sale of the Percentage of the Future Receivables are intended to be a sale and not an assignment for security. MCS, however,  shall not file a UCC-1 against the Collateral other than the Future Receivable Collateral (such Collateral other than Future Receivable Collateral, the "Other Collateral")) unless and until an Event of Default occurs, and then MCS may elect, among its rights and remedies, to file a UCC-1 against the Other Collateral.  Merchant further hereby irrevocably collaterally assigns to MCS 100% of all Future Receivables that are otherwise payable to Merchant after the Percentage of the Future Receivables are paid to MCS (as provided for above) as additional collateral for Merchant's obligations under this Agreement.  If there is an Event of Default as provided for in Section 3.2.3 herein, in addition to all other rights and remedies available to Merchant,  the Balance (as defined above) shall be all immediately due and payable to MCS, and MCS may exercise any one or more of the rights and remedies granted to it pursuant to this Agreement or given to a secured party under applicable law, including but not limited to the California version of the Uniform Commercial Code, as such laws may be amended from time to time, including but not limited to the right to take possession and sell, lease or otherwise dispose of the Collateral and, at its option, operate, use or exercise any rights of ownership pertaining to the Collateral as MCS deems necessary to preserve the value and receive the benefits of the Collateral.  Upon the occurrence of an Event of Default, MCS may, so far as Merchant can give authority therefore, enter upon any premises on which the Collateral or any part thereof may be situated and take possession of and remove the same therefrom and gives permission to MCS to conduct a sale of any or all of the Collateral, which sale may be conducted on any real property owned or leased by Merchant without charge or interference by Merchant. MCS may require Merchant to make the Collateral available to MCS at a place to be  designated by MCS that is reasonably convenient to both parties. Merchant waives all claims for damages by reason of any seizure, or repossession of the Collateral under the terms of this Agreement provided that MCS's actions are permissible under the California Uniform Commercial Code (or any other applicable law) and do not constitute a breach of this Agreement.  The assignment and security interest set forth in this paragraph will terminate upon Merchant's complete fulfillment of all of its obligations under this Agreement.  Merchant hereby appoints MCS as its attorney in fact to execute all documents on behalf of Merchant and take all actions on behalf of Merchant to effectuate the provisions of this paragraph 4.7 with respect to MCS's interest in the Collateral, the collateral assignment of the Future Receivables to MCS, and with respect to MCS's ownership interest in the Percentage of Future Receivables. MCS will not be chargeable for any negligence, mistake, act or omission of any employee, accountant, examiner, agent or attorney employed by MC<u>S</u> (except for their gross negligence or willful misconduct) in making  examinations, investigations or collections, or otherwise in perfecting,

maintaining, protecting or realizing upon any lien or security interest or any other interest in the Collateral or other security for the Obligations.

4.8 <u>Sale</u>. The Purchase Price paid by MCS reflects a purchase of the Percentage of the Future Receivables and is not intended to be nor shall it be construed as a loan from MCS to Merchant.  In addition, Merchant agrees to be responsible for any sales or excise taxes (or other related tax) arising out of the transactions contemplated by this Agreement, and will indemnify MCS for any liabilities, fees, costs, taxes or otherwise arising from such liability.

4.9 <u>Attorneys Fees</u>. Merchant agrees to pay all costs and expenses, including reasonable attorneys' fees incurred by MCS, to enforce the provisions of this Agreement (including the Guaranty below), payable upon demand, and such costs and expenses shall bear interest commencing on the date of incurrence by MCS at the lower of 18% per annum or the maximum interest rate permitted under California law.

4.10    <u>Counterparts.</u>  This Agreement  may be executed in multiple counterparts, each of which will be deemed an original and all of which taken together will constitute one instrument.  This Agreement  will also be binding upon the exchange facsimile signatures.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by persons duly authorized as of the date and year first above written.

MCS:                    Rita's Cafe                    Shareholder/Owner*


By _____     By _____     By_____
Name _____     Name <u>Rita Pimental</u>     Name <u>Rita Pimental</u>
Title_____     Title _____     Address:_____

                                              _____

                                              SSN #:_____

   * as to the provisions above which reference Shareholder/Owner and as  to the Guaranty below.

8

### Guaranty of Covenants ("Guaranty")

The undersigned Shareholder/Owners (collectively, "Guarantor"), who are the owners of the Merchant, hereby jointly and severally unconditionally and irrevocably guarantee to Merchant Capital Source, LLC ("MCS") the performance of the Guaranteed Obligations (defined below) and the immediate payment of all monies owed to MCS by Merchant under the Agreement in the event of breach of the Guaranteed Obligations by Merchant, whether or not the Guaranteed Obligations are found to be invalid, illegal or unenforceable, this being a guaranty of payment and not a guaranty of collection. This Guaranty shall remain in full force and effect notwithstanding the fact that, at any particular time, no Guaranteed Obligations may be outstanding. All of the terms of Sections 4.3 through 4.5 and Sections 4.9 and 4.10 of the above Agreement, including Shareholder/Owner's agreement that the exclusive jurisdiction for all disputes arising out of this Guaranty shall be Orange County, California, are hereby incorporated herein by reference except that reference to "Agreement" in such Sections shall mean this Guaranty. **GUARANTOR WAIVES ANY AND ALL SURETYSHIP DEFENSES, WHETHER ARISING BY CONTRACT, STATUTE OR BY OPERATION OF LAW.** Guarantor agrees to pay all costs and expenses, including reasonable attorneys' fees incurred by MCS, to enforce the provisions of this Guaranty, as determined by the court. In addition, each Guarantor agrees to pay on demand all damages incurred by MCS arising out of a breach of any of the Merchant covenants of Merchant that are listed below, including, without limitation, the full amount of all monetary obligations owed by Merchant to MCS under the Agreement. Guarantor waives all protection afforded it under California law or other applicable law and any related rights to revoke this Guaranty as to future Guaranteed Obligations.

The Guaranteed Obligations are the following covenants and obligations of Merchant made under the Agreement and restated as follows:

i.    Merchant agrees that it will not, cancel the Processing Agreement, or, without approval of MCS which approval may be withheld in MCS's sole discretion, modify the Processing Agreement if it adversely affects the amount or procedure by which monies are payable to Merchant or in any way affects the rights of MCS under this Agreement. Merchant further agrees not to use any other credit card processing agent other than the Processor that has been approved by MCS, until MCS has received complete payment of the Target Amount.

ii.    Merchant agrees to (i) exclusively use the Processor to process all of its credit card transactions, (ii) conduct and maintain its business according to past custom and practice, (iii) not to discourage the use of credit cards as a means of payment for its products and/or services, (iv) not to permit any event to occur which could have an adverse effect on the use, acceptance or authorization of credit cards as a means of payment for its products and/or services, (v) not to change its relationship, contractual or otherwise, with the Processor in a way that would be adverse to MCS, (vi) not sell, dispose, lien, encumber, pledge, convey or otherwise transfer its business or assets or any

ownership interests in its business without (x) the express written consent of MCS, and (y) the written assumption of all Merchant obligations set forth in this Agreement.

This Guaranty may not be changed or amended or terminated unless agreed to in writing by MCS.

Dated this 7 day of April, 2008.

Guarantor:
By_____
Name: Rita Pimental

Witnessed by:_____
Name:_____

10

EXHIBIT A
(DESCRIPTION OF COLLATERAL)

Secured Party: Merchant Capital Source, LLC
Debtor: Rita Pimental dba Rita's Cafe

All of Debtor's property, now existing and hereafter arising or coming into existence and no matter where located:

1.     All of Debtor's Accounts, Inventory, Equipment, General Intangibles, Chattel Paper, Investment Property, Instruments, Documents, Letter of Credits Rights, Supporting Obligations.

2.     All moneys, credits, securities, investment property, and other property of any nature whatsoever of Debtor now or hereafter in the possession of, in transit to or from, under the custody or control of, or on deposit with (whether held by Debtor individually or jointly with another and including specifically but not by way of limitation all demand, time, savings, passbook, or other similar accounts) Secured Party, including but not limited to cash collateral accounts; and  the proceeds (including insurance proceeds) and products of the foregoing in whatever form the same may be, for the purpose of securing the payment to Secured Party of all of the following (**"Obligations"**):    all loans, advances, debts, liabilities, indemnities, obligations, covenants and duties owing to Secured Party from Debtor of any kind or nature, present or future, whether or not evidenced by any note, guaranty, purchase agreement or other document, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guarantee or in any other manner, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising. The Obligations include, without limitation,  the Debtor's obligations to MCS arising out of the purchase by MCS of certain future credit card processing receivables of the Debtor as evidenced by that certain Purchase Agreement dated April 7, 2008, and all amendments and modifications thereof entered into between Debtor as seller and MCS as purchaser.

3.     Capitalized terms used herein and not otherwise defined will be given the definitions set forth in the Uniform Commercial Code in force and effect in the State of California.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Cormac J. Carney  and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV11- 918 CJC  (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [_] **Western Division** | [X] **Southern Division** | [_] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)          NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

James F. Clapp (145814)
Zach P. Dostart (255071)
DOSTART CLAPP & COVENEY, LLP
4370 La Jolla Village Dr., Ste. 970
San Diego, CA 92122
Tel: (858) 623-4200
Fax: (858) 623-4299

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RITA PIMENTAL dba RITA's CAFÉ, individually and on behalf of all others similarly situated<br><br>            PLAINTIFF(S)<br><br>   v.<br><br>MERCHANT CAPITAL SOURCE, LLC<br>            DEFENDANT(S). | CASE NUMBER<br><br>**SACV11-00918 CJC (RNBx)**<br><br><br>**SUMMONS** |

TO:DEFENDANT(S): <u>MERCHANT CAPITAL SOURCE, LLC</u>

 A lawsuit has been filed against you.

 Within <u>21</u> days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, <u>James F. Clapp</u>, whose address is <u>4370 La Jolla Village Dr., Ste. 970, San Diego, CA 92122</u>. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:   JUN 17 2011

By:   ROLLS ROYCE PASCHAL

        Deputy Clerk

       *(Seal of the Court)*

            1144

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
RITA PIMENTAL dba RITA's CAFÉ, individually and on behalf of all others similarly situated

**DEFENDANTS**
MERCHANT CAPITAL SOURCE, LLC

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
James F. Clapp (145814)
DOSTART CLAPP & COVENEY, LLP
4370 La Jolla Village Dr., Ste 970
San Diego, CA 92122
Tel: (858) 623-4200

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☒ Yes ☐ No      ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U. S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Article XV, Section 1(2) of the California Constitution- Usury, Unfair Competition, Money Had and Received, Declaratory Relief

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **SOCIAL SECURITY** |
| ☒ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | ☐ 61 HIA(1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities – Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **REAL PROPERTY** | | ☐ 640 R.R.& Truck | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities – Other | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | **IMMIGRATION** | ☐ 690 Other | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:** Case Number: **SACV11-00918 CJC (RNBx)**

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)          CIVIL COVER SHEET          Page 1 of 2

American LegalNet, Inc.
www.FormsWorkflow.com

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ No ☐ Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☒ No ☐ Yes

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Humboldt County |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Humboldt County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER):   _[signature]_      Date   4/14/11

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com